# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSEPH SHEHAN,
    *Plaintiff,*

    v.                        No. 3:22cv879 (OAW)

WARDEN BARONE, et al.,
    *Defendants.*

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS ACTION** is before the court upon Defendants' Motion for Summary Judgment and memorandum in support thereof (together, "Motion"). *See* ECF Nos. 37 and 37-1. The court has reviewed the Motion, Defendants' Statement of Facts, ECF No. 37-2, Plaintiff's responsive documents, ECF Nos. 46, 52, 57,[1] Defendants' replies in support of the Motion, ECF Nos. 47 and 61, Plaintiff's sur-reply, ECF No. 62,[2] all exhibits, and the record in this matter, and is thoroughly advised in the premises. For the reasons discussed herein, the Motion is **GRANTED.**

## I.    BACKGROUND

At all times relevant to this ruling, Plaintiff Joseph Shehan was a sentenced inmate housed at MacDougall-Walker Correctional Institution ("MacDougall") in the custody of the Department of Correction ("DOC"). ECF No. 37-2 ¶¶ 1–2; ECF No. 57-3 ¶¶ 1–2. After

---

[1] Because he is self-represented, the court granted Plaintiff several opportunities to respond to Defendants' motion for summary judgment. *See* ECF Nos. 51 and 55. Defendants replied to both responses. *See* ECF Nos. 47 and 61. The court has reviewed all responses and replies in the interest of ruling from the fullest record possible.

[2] Though Plaintiff did not seek leave to file a sur-reply, the court accepts it as part of the record because it does not present any new arguments or allegations.

initial review, the court permitted Plaintiff to proceed on claims for damages under 42 U.S.C. § 1983 and related state law claims against Defendants Chervenak,[3] Faba, and Amaral.[4]  *See* ECF No. 11.   Broadly speaking, Plaintiff asserts that Defendants violated his Eighth Amendment rights by exhibiting deliberate indifference to his safety at MacDougall when they allowed him to be assaulted by another inmate, Carlos Ayala ("Ayala"), on January 24, 2022.  It is undisputed that on that date, Ayala was standing outside of Plaintiff's cell when the cell door was unlocked for the administration of medications, and Ayala entered the cell and beat Plaintiff, causing injuries that required emergency medical attention and left Plaintiff with permanent disfiguration.

The specifics of the incident, though, are contested.

Plaintiff contends that Defendants were aware that Ayala posed a threat to Plaintiff because (1) earlier that day, Defendant Faba told Ayala that the inmates housed below him (whom Ayala apparently deduced to be Plaintiff) complained about Ayala banging on the walls, which—according to Plaintiff—would be considered by inmates to be "snitching," ECF No. 57 ¶¶ 7–10; *see also* ECF No. 16 ¶¶ 16–17; and (2) Defendant Faba was in the cellblock during meal service, when Ayala took advantage of the open cell door to yell threats at Plaintiff.[5]  *Id.* ¶ 9.  Later, when Plaintiff's cell door was unlocked for distribution of medications, Ayala threw something inside that temporarily blinded Plaintiff,

---

[3] The case caption names this defendant as Officer "Chervenck," but the court will adopt the Motion's spelling, "Chervenak," as used by counsel for this defendant.

[4] Defendants assert that Plaintiff's responses attempt to revive claims predicated upon Defendants' alleged disregard of DOC directives and COVID protocols, which claims already were dismissed as not plausible at the initial review stage.  ECF No. 11 at 12.  However, the court does not construe Plaintiff's submissions as seeking to resurrect those claims.  Rather, references to COVID protocols appear to be contextual factual allegations, and the court only considers them as such.

[5] Ayala allegedly called Plaintiff a snitch and a rat and told Plaintiff to pack his property and leave the housing block "or else."  ECF No. 57 ¶ 9.

and then ran into the cell and attacked him.  *Id.* ¶¶ 12.  Plaintiff claims that Defendant Faba closed the cell door and held it shut, trapping Plaintiff inside.  *Id.* ¶¶ 14–15.

Defendants assert that they never heard Ayala threaten Plaintiff and were unaware of any danger Ayala posed to Plaintiff, and that they appropriately responded to the fight. ECF No. 37-2 ¶¶ 31–32, 58, 61–63.  Defendant Faba disclaims any memory of scolding Ayala and he explicitly denies holding the cell door closed.  *Id.* ¶¶ 35, 55.

Existing video footage was provided.[6]  It has no audio (anything said is unknown), and visibility of the incident is limited to certain angles.  After viewing it several times, the court now describes it for the record.

The video depicts Plaintiff's cell block, which has a large open area furnished with cafeteria-style tables, phones, and cushioned chairs.  Around this common space is a lower tier of cells, and two stairwells leading to an upper tier of cells above them.  Each cell has what appears to be a heavy, metallic door with a window near its top.

The video shows Ayala leave his upper-level cell and walk downstairs, where he appears to be on the phone for approximately 15 minutes.  Thereafter, he approaches Plaintiff's cell.  The cell door appears to be opened by its occupant, and Ayala steps into the doorway area.  It appears there is some interaction between Ayala and presumably Plaintiff, and a nearby inmate appears to open his door and poke out his head, as Defendant Faba quickly begins to approach Ayala from behind (1:00:09).  Still outside Defendant Faba's reach, Ayala enters Plaintiff's cell (1:00:11) and appears to shut the cell door behind him, before Defendant Faba can get to it with his outstretched arm. Defendant Faba appears to radio for assistance and to wave for help from other officers.

---

[6] Of the three videos manually filed by Defendants, "MAC-VP-22-110 Part 2,1:00:02-1:00:11" ("Video") best shows the incident (at the one-hour mark), and thus is the video hereinafter referenced by the court.

He also attempts to tug on the door (1:00:24) and to continue calling for other officers while seemingly giving orders to the several inmates who at that time were milling about. As the inmates vacate the area and return to their cells, other officers arrive (1:00:53). One of the responding officers appears to have a key, which they use to unlock the cell, and several officers enter to stop the incident (1:01:14). The incident appears to have been resolved within one minute, at which point Ayala is removed from Plaintiff's cell.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists . . . ." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995)). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* The court must disregard all evidence favorable to the moving party that a jury would not be required to believe. *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id.* (quoting Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

However, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on

conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)).  Instead, the party opposing summary judgment must set forth "sufficient evidence . . . for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." *Brown*, 654 F.3d at 358 (quoting *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

## III.    **DISCUSSION**

Before turning to the substance of the Motion, the court first must address a procedural argument.  Defendants contend that Plaintiff has failed to submit a proper statement of undisputed facts, despite having been given several opportunities to do so, as Plaintiff does not cite to record evidence to support the facts with which he disagrees.  Consequently, Defendants argue that their alleged facts must be deemed conceded. *See, e.g.,* ECF No. 61.

The court declines to take so drastic a measure in this case.  There is video of the incident in question, and Plaintiff is self-represented, incarcerated, and inexperienced in litigation as compared to defense counsel.  Accordingly, the court will use its discretion to extend a measure of leeway to Plaintiff where (1) he seems to have made a good faith

attempt to discharge his duties under Local Rule 56(a)(2), and (2) his lack of citation to record evidence does not prejudice Defendants given how few exhibits he has submitted (many of them being exhibits Defendants also filed), thus their review was not onerous. Defendants' procedural argument therefore is rejected.  Of course, the court disregards Plaintiff's allegations which are disproven by video and other record evidence.

The court turns now to the substantive arguments.

## A. Eighth Amendment

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).  Thus, prison officials have a constitutional duty "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988) (internal quotation marks omitted); *see also Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (holding that prison officials must "take reasonable measures to guarantee the safety of the inmates.") (quoting *Farmer*, 511 U.S. at 833) (internal quotation marks omitted).  But not every injury inflicted upon one inmate by another yields constitutional liability.  *Farmer*, 511 U.S. at 834.

### 1. Defendants Amaral and Chervenak

It is apparent from the undisputed facts and the video footage that the record fails to support any Eighth Amendment claim against Defendants Amaral and Chervenak.  "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*,

950 F.2d 880, 885 (2d Cir. 1991)).  Neither of these individuals had any direct involvement in the incident and in fact, it is undisputed that neither of them even was present. Defendant Amaral, acting as a superviser, arrived at Plaintiff's cell only after the assault in response to the code called by Defendant Faba.  *See* ECF No. 37-2 ¶ 56; ECF No. 57-3 ¶ 56.  The United States Court of Appeals for the Second Circuit has held that "there is no special rule for supervisory liability," and that a plaintiff must show "'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  Plaintiff apparently presumes Defendant Amaral was notified about Ayala's threat to his safety, ECF No. 57-3 ¶ 16, but his speculative belief is insufficient to satisfy the requirement of personal involvement. Plaintiff also imputes fault to Defendant Amaral for allowing his staff to ignore close observation of COVID protocols, which the court infers Plaintiff believes would have prevented the attack.  But there are insufficient facts alleged to show that Defendants were not following protocols, and there is no evidence Defendant Amaral encouraged routine disregard for them.  Accordingly, there is nothing in the record to support Plaintiff's theory of liability as to Defendant Amaral.

Next, while Plaintiff alleged in the amended complaint that it was Defendant Chervenak who opened Plaintiff's cell door, thereby permitting Ayala to enter, ECF No. 16 at ¶¶ 46–48, it now is undisputed that by the time of the incident, Defendant Chervenak already had left the cellblock to relieve an officer offsite.  ECF No. 37-2 ¶¶ 23–26; ECF No 57-3 ¶¶ 23–26.  Plaintiff still contends that Defendant Chervenak bears some responsibility for the attack, though, because he was aware of Ayala's threats and failed

to alert his replacement of the same.  ECF No. 57-3 ¶ 26.  But it is unclear Defendant Chervenak was in a position to hear the alleged threats in the first place, since he apparently spent his shift in the control room, and there is no description of the control room itself anywhere in the record, much less any allegation that anything from the cellblock could be heard therein.  Moreover, presuming he could have heard the alleged threats, it is undisputed that Defendant Chervenak ended his shift at MacDougall before the attack occurred, and there is no indication that he could have known Plaintiff and Ayala would be released simultaneously after his departure. *See* ECF No. 37-2 ¶ 23. Even Plaintiff states that he was not worried about the threats (to the point that he did not report them to anyone) because he did not think he would encounter Ayala[7] before everyone had calmed down.  ECF No. 57-3 ¶ 61; *see also* ECF No. 37-7 at 6.[8]  Thus, there are no facts to show that he was aware of the threat, and even if he was aware, there are no facts to show how he possibly could have intervened.

Based upon the current record, no reasonable jury reasonably could conclude that Defendant Chervenak or Defendant Amaral committed any Eighth Amendment violation. Thus, the court hereby grants the Motion as to the federal claims against them.

### 2.  Defendant Faba

To support a claim of deliberate indifference to health or safety, an inmate is required to satisfy an objective element and a subjective element.  *Farmer*, 511 U.S. at 834.  To meet the objective element "[f]or a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk

---

[7] In fact, available video seems to show Plaintiff's cell door being pushed open for Ayala from within moments before the assault occurred.

[8] This citation refers to the page number assigned by the court's electronic filing system, since the internal pagination is inconsistent.

of serious harm." *Id.* To meet the subjective element, the inmate must show that the defendants knew that he faced a substantial risk of harm but failed to take action to mitigate that risk. *Id.* at 837. This means that the defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.*

There are two actions upon which Plaintiff predicates his deliberate indifference claim against Defendant Faba: the alleged identification of Plaintiff as a snitch, and the response to the attack itself. The court will address these seriatim.

### a. Preventing the Attack

Defendant Faba asserts that the only encounter he recalls between Plaintiff and Ayala on the day is question occurred when Plaintiff was cleaning the top tier and the two spoke to each other without agitation or hostility. ECF No. 37-2 ¶¶ 31–32. But Plaintiff has produced evidence from another inmate averring that Defendant Faba told Ayala that "inmates housed below him" were complaining of his banging on the wall (which Ayala had been doing in order to get the attention of another inmate), and that this caused Ayala to "become incensed," and to scream threats at Plaintiff, whom Ayala called a "snitch." ECF No. 57-4 at 70.[9]

Relevant to this point, Plaintiff asserts (and Defendants do not deny) the inmates were confined to their cells due to COVID protocols, rendering the cellblock quiet enough for Ayala's threats to have been audible to those nearby.[10] ECF No. 57-3 ¶ 4. And while

---

[9] Citations to this document refer to the pagination supplied by the court's electronic case filing system, there being no consistent internal pagination.

[10] While none of the corrections officers on duty reportedly heard Ayala's yelling, incident reports of the assault suggest unit staff heard the inmates "talking trash" and that one called the other a snitch, so it appears that some officers did know of this conduct, though it is unclear how or when they knew. ECF No. 37-4, at 14–16. It appears they did not learn this information from the involved inmates themselves, though, as the reports repeatedly state that the inmates would not give a reason for the fight. *Id.* at 18.

Defendants contend there is no evidence that complaining about a disruptive inmate would be considered "snitching" by other prisoners, it is unclear what definitive authority Plaintiff possibly could cite for this proposition, and so the court will accept it as true. Regardless, the court finds it reasonable to infer that Defendant Faba would have known by virtue of his profession that exposing Plaintiff to identification by reasonable deduction was likely to instigate Ayala's ire toward Plaintiff.[11]  Accordingly, the court finds there is sufficient record evidence to support this portion of Plaintiff's version of events, and thus that there is a genuine factual dispute as to (1) whether Defendant Faba told Ayala that inmates below him were complaining, and (2) whether he heard Ayala's threats.

Presuming all these facts in Plaintiff's favor, though, Defendant Faba's comment to Ayala still does not satisfy the objective element of a deliberate indifference claim. Even after Ayala had threatened him, Plaintiff himself did not feel concerned enough to inform any of the officers that he felt in danger.  Rather, given that the cellblock was observing COVID protocols, he felt that the chances of Ayala and Plaintiff crossing paths was low, and that in time they would be able to get past their argument.  In fact, as will be discussed in further detail, video suggests Plaintiff might have opened the door to his cell for Ayala just before the incident, and it does not suggest that Plaintiff tried to get Defendant Faba's attention when Plaintiff noticed Ayala at the opened door to his cell, or that he immediately tried to avoid being inside the cell while Ayala was near its entry point just prior to the assault, or even that Plaintiff tried to shut the cell door, which would have locked it, before Ayala could have advanced into the cell with Plaintiff.

---

[11] Plaintiff need not show Defendant Faba understood the comment would endanger Plaintiff.  *Farmer*, 511 U.S. at 843 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.").

Plaintiff further alleges that Defendant Faba was not following COVID protocols, and that he was permitting too many inmates to remain outside their cells, but this allegation is unsupported and too general.  Absent any allegation that Ayala should not have been out of his cell, or that he was out of his cell too long, the court cannot find that the COVID protocols are relevant at all.  Most importantly, though, if Defendant Faba knew of the threat posed by Ayala (as the court must presume at this posture), that is enough to obligate him to look after Plaintiff, even absent any independent duty to enforce COVID prevention measures.  Thus, whether or not COVID protocols permitted Ayala to make a 15-minute call, Defendant Faba's obligations to Plaintiff were the same.

However, it is unclear what Defendant Faba ought to have done differently in response to the risk.  It appears Defendant Faba had nothing to do with releasing Ayala from his cell (as locking and unlocking cells is performed by the control room officer), video appears to show the door being pushed open from within (as apparently consistent relative to other cell doors appearing to be opened and pulled shut by inmate occupants), and in any case, there was no apparent risk of harm while Ayala was out of his cell and Plaintiff was safe inside his.  During his phone call, Ayala exhibited no signs of aggression which might have caught Defendant Faba's attention.  And though Defendant Faba was otherwise engaged in his duties when Ayala headed to Plaintiff's cell, video shows (with no allegation to the contrary) Defendant Faba approach Ayala from behind prior to his entry into Plaintiff's cell.  As he had nothing to do with opening Plaintiff's cell door, Defendant Faba was not on notice Ayala and Plaintiff would be out of their cells at the same time such that closer attention to them might be indicated, nor does he appear to have been aware of the moment the risk of harm arose, namely, when Plaintiff's door was

unlocked and then opened from within.  Thus, at the time the objective element was satisfied, the subjective element still was not.  And by the time the subjective element was satisfied, that is to say, when Defendant Faba noticed Ayala outside Plaintiff's cell, he was too far away from them to prevent Ayala from entering the cell, whether or not Defendant Faba closed the cell door himself.  Finally, it is undisputed that it would have been dangerous for Defendant Faba to enter the cell alone while two inmates were fighting.  There never was a point where (1) there was a substantial risk of serious harm, (2) Defendant Faba was aware of that risk, *and* (3) he failed to respond accordingly.  The record cannot support a deliberate indifference claim against Defendant Faba for anything prior to Ayala entering Plaintiff's cell.

Despite Defendants' argument that Plaintiff opened his cell door, and thus that he is to blame for the attack against him (and even might have invited it), ECF No. 37-2 ¶¶ 41, 59, Plaintiff denies opening the cell door for Ayala,  ECF No. 57-3 ¶¶ 41, 59.  And even if the video does not definitively show Plaintiff *personally* opening the cell door, it seems clear that it was *not* opened from the outside (by Ayala, and certainly not by Defendant Faba).  Additionally, the record has no indication that Plaintiff had a cellmate. Defendant Faba explains, "Cell doors default to a locked position for safety and security reasons," and that, "Once locked, the only way a cell door can be reopened is with a key" (which Defendant Faba apparently did not have), or remotely by an officer in a control room.  ECF No. 37-6 ¶¶ 24–25.  This also suggests the door could have been locked by an inmate within the cell pulling it shut again.  So, to the extent Defendant Faba explains, "Until Plaintiff opened his cell door at 9:15 PM, I was not aware that Plaintiff's cell door had been unlocked by control while Ayala was out of his cell," *id.* ¶ 26, it is unclear (even

with available video) whether Plaintiff himself opened his cell door knowing Ayala was on the other side of it, and whether he remained in a position to secure his cell by pulling its door shut again.  Therefore, on the record before it, the court cannot conclude Plaintiff played a part in his victimization, even though the court reiterates the cell door appears to have opened *from within,* while Ayala was away from it, Video, 1:00:02, which strongly suggests it was opened by Plaintiff, even if it had been unlocked by control.

Nonetheless, as Defendant Faba clearly did not open the cell door, his conduct before the attack cannot support a deliberate indifference claim.  Thus, the Motion is granted as to any Eighth Amendment claim for the failure to prevent the attack.

### b.  Preventing Escape

The court next turns to Plaintiff's claim that Defendant Faba prevented his escape from the beating by closing his cell door after Ayala entered and then holding it shut.  It is undisputed that after Ayala entered the cell, the door automatically locked upon being shut and only could be unlocked by the officer in the control room or with a key (which Defendant Faba did not have).  Video clearly shows Defendant Faba approach Ayala from behind (1:00:08) *before* he enters the cell, and the door close behind Ayala as Defendant Faba approached; as the door was shutting, Defendant Faba quickly reached out his right arm and hand while slightly leaning *away* from the door[12]  (1:00:13).

To the extent the door would automatically lock upon being shut (whether shut by Plaintiff or Ayala), Defendant Faba clearly does not wait for it to close, or wait for Ayala to enter the cell before his approach, or lean into the door[13] in any way.  Once the door

---

[12] This would seem consistent with an attempt to *pull it open* or to *keep it open*, though the court will not resort to speculation or credibility assessments at summary judgment.

[13] One might expect someone to lean *toward* a door they intend to shut instead of leaning *away* from it, but again, the court sets aside that likelihood at summary judgment.

shuts, Defendant Faba appears to immediately call for backup via radio and gestures, and he also appears to try to tug at the door in what appears to be an attempt to **open** it.

However, one aspect of Plaintiff's claim cannot be ruled out by the video evidence alone.  Plaintiff claims that while Ayala was assaulting him, Defendant Faba held his foot to the base of the cell door, preventing Plaintiff's escape.  ECF No. 16 at 3 ¶ 14.  Plaintiff also provides supporting declarations from three inmate witnesses.  ECF No. 57-4, at 68 (Ex. I).  There is **one moment** in the video at which Defendant Faba arguably takes a side step with his right foot near the base of the door, with his right shoulder near the door (but not apparently touching it).  Video, at 1:00:21.  This side-step is a **light** side-step. Without definitive evidence as to the operation of the door, and without more conclusive video evidence, it might seem at first glance that these facts support a claim which must survive summary judgment.   However, Defendant Faba explains that cell doors automatically lock once latched, and that they only can be reopened with a key or by an officer in the control booth.  This fact is not disputed by Plaintiff or his witnesses.  Further, video from prior to the assault supports this explanation of cell door mechanics.  At 58:22 and 59:48, the doors of lower-tier cells apparently are remotely unlocked such that they are opened from **within** those cells, and then prisoners seem to keep them at least slightly ajar to ensure they can reenter.  Neither Plaintiff nor his witnesses claim the cell doors, once unlocked, remain unlocked once reshut, so the court need not resort to speculation as to the footed door, because video refutes that claim.  Plaintiff does not claim to have *seen* Defendant Faba shut and barricade the door with his foot at its base, nor could he plausibly do so from within the cell.  And inmate witness accounts that Defendant Faba shut and held the door while calling for assistance are clearly refuted by video evidence.

Just as Plaintiff's claim does not plausibly allege Defendant Faba closed the door (or that Defendants Amaral or Chervenak were present), Plaintiff cannot plausibly claim Defendant Faba kept it shut and locked during the assault.

Further, with all parties and witnesses apparently agreeing that the cell door was closed at the time Plaintiff alleges Defendant Faba held it shut with his foot, it is clear that even if Defendant Faba *did* hold his foot against the closed cell door, that would have had no effect since the closed door already would have returned to being automatically locked. And to the extent the inmate witnesses claim Defendant Faba kept his foot at the base of the door until the other inmates returned to their cells, this is disproven by the video evidence without the need to resort to credibility or speculation.

Moreover, if Defendant Faba had shut Plaintiff's cell door (locking it), he would not have had to hold it shut in order to prevent Plaintiff's escape, because standard operation of the cell doors would have resulted in its remaining locked upon having been shut. So, without usurping the province of a jury, the uncontroverted explanation that cell doors lock upon being shut refutes Plaintiff's claim that Defendant Faba acted to keep it shut, and thus this claim cannot survive summary judgment. While it might be possible that Ayala's violence prevented Plaintiff's escape, the evidence shows that Defendant Faba did not.

Finally, Defendants argue Defendant Faba had no Eighth Amendment obligation to protect Plaintiff from the harm of Ayala's assault because Plaintiff invited it by opening his door and challengining Ayala, "Let's do this." ECF No. 37-1 at 17. The credibility of the claim that Plaintiff was the initial agressor is challenged by Plaintiff's account of the incident and thus would have to be left to a jury's determination, but the uncontroverted

claims and evidence in this case (including video) support  summary judgment, rendering moot this defense.

In summary, the evidence (including video) and uncontroverted facts combine to make clear as a matter of law that Defendant Faba (1) did not close the cell door behind Ayala, and (2) did not cause it to remain locked during the assault since it automatically locked once it was closed, thus he did not violate Plaintiff's Eighth Amendment rights.

### B. Qualified Immunity[14]

Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (quoting *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015)) (internal quotation marks omitted).  A right is clearly established if, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations in original).  "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk Cty., New York*, No. 19-4167, 2021 WL 5183543, at *17 (2d Cir. Nov. 9, 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)) (internal quotation marks omitted).  Even when a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct did not violate that clearly established right.  *See Manganiello v. City of New*

---

[14] Prior findings as to Lieutenant Amaral and Officer Chervenak moot the need for discussion in this section.

*York,* 612 F.3d 149, 165 (2d Cir. 2010) (stating that a factfinder must determine "whether officers of reasonable competence could disagree as to the lawfulness of such conduct."). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful— then the officer is immune from liability." *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017).

It cannot be disputed that "[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 832– 33). The Supreme Court of the United States has held that prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks and citations omitted). The right at issue therefore clearly was established at the time of the incident.

Defendants assert that the right at issue was not so clearly defined that a reasonable officer would know their conduct violated it. More specifically, that:

> There is no case holding that Correctional Officers have a constitutional obligation to take action to protect an inmate-recipient of loudly stated offensive remarks who is subsequently attacked in his cell by the maker of those remarks after opening his cell door to let his attacker in where previously, and despite ample opportunity to do so, that individual failed to report concerns regarding those remarks to correctional staff and had no prior history with his assailant.

ECF No. 37-1 at 24. However, as the court rejected the claim that Plaintiff irrefutably was the initial aggressor, the court must reframe the scenario under review.

Still, Defendant Faba quickly approached Ayala while he stood at the door to Plaintiff's cell after the door had been opened from within. He reached for the door as it was being shut from within, but he did not force it to remain open before it was closed.

17

The door, having been shut, immediately locked and Defendant Faba did not have a key, but he immediately began calls for backup, which arrived within one minute.

Qualified immunity would attach if a reasonable officer could be unaware that this conduct would constitute an Eighth Amendment violation, and the court must so find.

Defendant Faba represented that he would not have entered Plaintiff's cell alone during the assault even if presented with such an opportunity. Granted, the uncontroverted evidence shows that the cell locked upon closure of its door, and video shows that it was shut from the inside. Nevertheless, Plaintiff does not assert an Eighth Amendment violation in Defendant Faba's position (whether DOC policy or not) that it would have unjustifiably risked officer safety to have entered the cell alone during the assault. On the facts presumed true at summary judgment, the court finds that a reasonable officer also could be unaware such hesitation to act alone would be unlawful.

In *Scittarelli v. Manson*, 447 S.Fupp. 279 (D.Conn. 1978), with half of a prison's 983 inmates in a large recreation yard, prisoners were preparing for a baseball game with several baseball bats accessible to them. During "an attack on the officers which continued for another 15-20 minutes . . . [wherein] ten correctional officers . . . sustained injuries, some of them serious, at the hands of the bat wielders," the plaintiff (a prisoner) attempted to flee from the riot back into the main cell block, but alleged that the defendant prison authorities "negligently caused or permitted the gate to be closed," thus he scaled a fence but fell, causing injuries which included breaking both of his legs. *Id.* at 281. Citing the immediate steps the defendants took upon signs of the impending violence, the court granted summary judgment in the defendants' favor. *Id.* at 284. Surely some key facts from *Scittarelli* are easily distinguishable from the case at bar, and of course this

Case 3:22-cv-00879-OAW    Document 65    Filed 09/19/25    Page 19 of 22

court's analysis is intensely fact specific, but with *Scittarelli* as an allegory, it is unavoidable that a reasonable officer could be unaware Defendant Faba's actions might be unlawful.

DOC is sure to adjust its policies, procedures, and best practices with experience, and it is reasonable to believe that a prudent officer might find it perfectly lawful and wise to avoid entering a prison cell alone during active inmate violence, particularly when that cell locks upon being closed and cannot be unlocked from within, requiring someone in the control room or with a key to unlock it before the officer will be able to escape. That the cell was opened from within could warrant extra caution, as prisoners could always feign intra-prisoner violence in order to coax an officer into a cell wherein they can shut the door (locking it) and outnumber that officer to assault him. Such inmate-on-officer violence might seem no more likely than at an inmate baseball game in the presence of hundreds of prisoners who have access to baseball bats, but an officer might find it reasonable to avoid such a possibility altogether, and indeed, training might suggest it.

It is unclear whether there are still inmate baseball games in Connecticut prisons, and whether they involve hundreds of inmates in prison yards with several available bats, but it would be understandable if DOC moved away from such activities as so described. Similarly, a reasonable officer might find it prudent and lawful under the circumstances to act as Defendant Faba did. In fact, they might even go so far as to believe holding the cell door shut would have been lawful and reasonable under those same circumstances. *See Williams v. Mueller*, 13 F.3d 1214, 1216 (8th Cir. 1994) (finding that failure to intervene does not necessarily amount to an Eighth Amendment violation). *Cf. Hayes v. New York City Dept. of Corrections*, 84 F.3d 614 (2d Cir. 1996) (reversing summary

judgment where the plaintiff suffered three separate, seriously violent attacks after warning of specific separation issues with certain individuals and seeking a transfer of prisons, which was denied by a security captain who previously had employed and since had remained friends with one of those assaultive inmates).

To be clear, this court does not now attempt to set a bright line rule finding that delaying intervention for one minute cannot constitute an Eighth Amendment violation, *see, e.g., Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016) (finding, within the context of a failure to intervene claim under 42 U.S.C. § 1983, that analysis of challenged conduct is nuanced, which "does not permit distillation of a hard-and-fast temporal cutoff . . . ."). Indeed, the fact-specific analysis of official action during an isolated, one-minute attack involving the active and ongoing stabbing of an already unconscious or incapacitated inmate might differ from the analysis of the type of conduct in the present case.

But here, presuming as true those facts alleged by Plaintiff which are not refuted by video evidence, Plaintiff's prison cell door was opened from within (and not by Ayala) before the assault, Defendant Faba began to approach Ayala before he entered the cell, Plaintiff's cell door was pulled shut from within (and was not shut by Defendant Faba), the door was locked once shut such that Defendant Faba could not open it himself, Defendant Faba immediately called for assistance by use of his radio and urgent hand gestures, and his actions allowed for intervention within one minute of the assault.  And even if Defendant Faba had attempted to hold the cell door closed once it was shut, that effort would have been unavailing because the cell door locked upon shutting.  Thus, Defendant Faba did not shut the door, nor did he prevent intervention – in fact, he sought immediate assistance, which arrived within one minute.

As held by the *Scittarelli* court, "Here, under all the circumstances, there was neither 'deliberate indifference' to the risk of injuries being inflicted upon the plaintiff by [a] fellow inmate[ ], nor inaction to prevent them from occurring as soon as the risk became apparent." Thus, qualified immunity shields Defendant Faba, even if there is an Eighth Amendment right which attached on the facts of this case.

### C.    State Common Law Recklessness

Under Connecticut law, "[t]he state of mind amounting to recklessness may be inferred from conduct" but "there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others . . . ." *Matthiessen v. Vanech*, 266 Conn. 822, 832 (2003) (quoting *Craig v. Driscoll*, 262 Conn. 312, 342–43, 813 A.2d 1003 (2003) (internal quotation marks omitted). Reckless conduct "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Vitale v. Kowal*, 101 Conn. App. 691, 699 (2007) (quoting *Elliott v. Waterbury*, 245 Conn. 385, 415, 715 A.2d 27 (1998)) (internal quotation marks omitted). "Recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man ...." *Doe v. Boy Scouts of Am. Corp.*, 323 Conn. 303, 330 (2016) (*en banc*)) (quoting *Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 382 (2015)).

For the same reasons discussed supra, the court finds that there are no facts to support this state law claim against Defendants Amaral and Chervenak. There is no evidence, or even a serious allegation, that either man had any involvement with either the events leading up to the assault or the assault itself. There is no indication that either

21

knew of any risk Ayala posed to Plaintiff, or that they took any unreasonable action in response thereto.  Accordingly, the Motion is granted on the state law claim as to these two defendants.

As to Defendant Faba, Defendants maintain that the evidence does not demonstrate that he acted with the requisite state of mind.  For all of the reasons already discussed at length, the court agrees.  Accordingly, the Motion is granted as to this claim against Defendant Faba.


IV.    **CONCLUSION**

Accordingly, it is hereupon **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, ECF No. 37, is **GRANTED.**

2. Plaintiff's two Motions to Inquire, ECF Nos. 63 and 64, are **DENIED as moot.**

3. The Clerk of Court respectfully is asked to please close this case.


**IT IS SO ORDERED** at Hartford, Connecticut, this 19th day of September, 2025.

_____/s/_____<br>
OMAR A. WILLIAMS<br>
UNITED STATES DISTRICT JUDGE